**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MIGUEL ANGEL BACIGALUPO, | Case No. 94-cv-02761-BLF |
| Petitioner, | |
| v. | **ORDER PARTIALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS** |
| KELLY SANTORO, Acting Warden, North Kern State Prison, | |
| Respondent. | |

## I. INTRODUCTION

The instant case arises from Petitioner's conviction and sentence, by a Santa Clara County jury, for the first-degree murders of two brothers, Orestes and Jose Luis Guerrero (Cal. Pen. Code § 187), two counts of robbery (Cal. Pen. Code § 211), possession of a firearm by an ex-felon (Cal. Pen. Code § 12021(a)), and personal use of a firearm (Cal. Pen. Code § 12022.5). *See People v. Bacigalupo*, 1 Cal. 4th 103 (1991). The jury also found true two special circumstances: multiple murder (Cal Pen. Code § 190.2(a)(3)) and murder during the commission of a robbery (Cal. Pen. Code § 190.2(a)(17)(i)). Petitioner was sentenced to death on June 16, 1987.

The California Supreme Court affirmed Petitioner's convictions and sentence on direct appeal on December 9, 1991. *See People v. Bacigalupo*, 1 Cal. 4th 103. The United States Supreme Court granted certiorari and vacated and remanded the California Supreme Court's judgment for further consideration in light of *Stringer v. Black*, 503 U.S. 222 (1992). *See Bacigalupo v. California*, 506 U.S. 802 (1992). The California Supreme Court subsequently upheld Petitioner's conviction and death sentence in its entirety. *See People v. Bacigalupo*, 6 Cal.

4th 457 (1993). The United States Supreme Court denied certiorari. *See Bacigalupo v. California*, 512 U.S. 1253 (1994).

Petitioner filed his first state habeas petition on May 10, 1993; it was denied by the California Supreme Court as untimely and on the merits on May 12, 1994. *See* Dkt. No. 247-6. Petitioner filed a Petition for Writ of Habeas in this Court on October 29, 1997. *See* Dkt. No. 87. After determining that several of Petitioner's claims were unexhausted, this Court dismissed the unexhausted claims and granted Petitioner's request to stay federal proceedings and return to state court. *See* Dkt. 164.

Petitioner filed his second state habeas petition on June 11, 1999. The California Supreme Court issued an order to show cause on March 14, 2001, and ordered a reference hearing on November 25, 2003.[1] Following the reference hearing, the parties filed briefs and the case was argued and submitted on May 30, 2012. *See* Dkt. No. 252 at 16. On August 27, 2012, the California Supreme Court granted relief from the death judgment on *Brady*[2] grounds. *See In re Bacigalupo*, 55 Cal. 4th 312 (2012). On September 11, 2013, it denied all remaining claims in a summary opinion. Petitioner was resentenced to life without the possibility of parole on February 4, 2014. *See* Dkt. No. 252 at 18.

On April 8, 2016, Petitioner filed an Amended Petition for Writ of Habeas Corpus in this Court. *See* Dkt. No. 228 ("Fed. Pet."). Respondent filed a corrected Answer on October 25, 2016, in which Respondent asserted procedural defenses as to several claims. *See* Dkt. No. 243 ("Answer"). Petitioner's Traverse, filed on March 7, 2017, withdrew the procedurally-objectionable claims, Claims E through K. *See* Dkt. No. 262 at 4 ("Traverse").

This Petition thus raises five issues in support of Petitioner's writ of habeas corpus: Claim A, that the trial court erroneously refused to instruct the jury that duress could negate the mental state necessary for a first degree murder conviction and precluded trial counsel from arguing that Petitioner did not premeditate and deliberate the crimes in part because of the threats and menaces

---

[1] The California Supreme Court vacated its original referee appointment and re-ordered the reference hearing on February 24, 2004.

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

against Petitioner and his family; Claim B, that trial counsel unreasonably failed to adequately investigate and present psychiatric, medical, and neurological evidence and cultural, family, and personal background that would have supported mental state defenses to guilt; Claim C, that the prosecution violated Petitioner's due process rights when it failed to disclose the testimony of confidential informant Gale Kesselman and then suborned perjury during the hearing on whether Kesselman's identity should be disclosed to the defense; Claim D, that the prosecution improperly withheld exculpatory information, including the statements of several witnesses whose testimony would have either led to Kesselman or corroborated Petitioner's claim that he was acting under death threats at the time of the crimes; and Claim L, that the cumulative effect of the errors at Petitioner's trial proceedings resulted in an unconstitutionally-imposed guilt verdict. *See* Fed. Pet. at 25, 34, 45, 78 & 90. Petitioner has not requested an evidentiary hearing.

## II. FACTUAL BACKGROUND

The Court summarizes the relevant evidence below.

### A. 1987 Trial Evidence

According to the California Supreme Court, the evidence adduced during Petitioner's trial[3] showed:

> In the afternoon of December 29, 1983, [P]etitioner, who had recently come from New York, began working in a San Jose, California, jewelry store owned by Orestes Guerrero, a Peruvian immigrant. The job had been arranged by [P]etitioner's mother, a Peruvian native who knew Orestes through the Peruvian community in the San Francisco Bay area. Present in the jewelry store on December 29 were owner Orestes Guerrero, his brother Jose Luis Guerrero, a Peruvian immigrant named Carlos Valdiviezo, and [P]etitioner. Later that day, [P]etitioner ordered Valdiviezo at gunpoint to lie down. Instead, Valdiviezo ran and hid in the store's bathroom; he came out only after hearing someone leave the store through the front door. Valdiviezo then discovered the dead bodies of Orestes and Jose Luis Guerrero; both had been shot. That evening, police arrested [P]etitioner at the Palo Alto home of his mother and stepfather, just as the stepfather was preparing to take [P]etitioner to the airport. Found in [P]etitioner's suitcases was jewelry taken from Orestes's store.

> Petitioner waived his constitutional rights under [*Miranda v. Arizona*, 384 U.S. 436 (1966)], and agreed to talk to the arresting officers about the murders.

---

[3] As Petitioner raises no claims related to his resentencing, the Court will not summarize the evidence presented during the penalty phase of trial.

Initially, petitioner denied any involvement in the killings, claiming he had spent the entire day alone at his mother and stepfather's house. He blamed the crimes on an acquaintance, Karlos Tigiboy, saying that Tigiboy looked "a lot like" [P]etitioner and that Tigiboy was "connected with the Mafia."

Later, however, [P]etitioner admitted killing the two Guerrero brothers, claiming he had been ordered to do so two weeks earlier by the Colombian Mafia under threats to kill [P]etitioner and his family, and that it was Tigiboy who had given him the order. The tape recording of [P]etitioner's interview with the police was introduced into evidence by the prosecution at the guilt phase of [P]etitioner's capital trial. Tigiboy, called as a witness for the prosecution, identified [P]etitioner, but denied ordering [P]etitioner to kill the Guerrero brothers.

In closing arguments to the jury at the guilt phase of the trial, the prosecution made this statement: "Now Mr. Aaron [defense counsel] is going to have to find something to talk about. What will it be? Perhaps he will argue that there was a Peruvian [*sic:* Colombian] Mafia that ordered the defendant to rob and kill Jose Luis and Orestes Guerrero. But there is absolutely no evidence of that." The prosecutor added: "The evidence is very clear . . . defendant didn't receive any instructions from anyone about robbing and killing the Guerreros. Only his greed sent him there."

*In re Bacigalupo*, 55 Cal. 4th at 317-18.

**B. Second State Habeas Allegations**

Petitioner's current claims rely on findings of fact made during proceedings related to his second state habeas petition. Many of the factual allegations pertinent to those claims stemmed from evidence related to an interview conducted by San Jose Police Department ("SJPD") Sergeant John Kracht on April 18, 1984, in which Kracht interviewed a confidential informant, later identified as Gale Kesselman, at the behest of two Santa Clara County District Attorney's Office ("DA") investigators, Sandra Williams and Ron McCurdy.

**1. *In Camera* Hearing**

In August 1985, while Petitioner awaited trial for the charged crimes, defense counsel filed a motion seeking disclosure of the confidential witness referred to in Kracht's report, claiming that the informant was a "material witness on the issue of [P]etitioner's guilt." *In re Bacigalupo*, 55 Cal. 4th at 318.

Sergeant Kracht's May 1984 report stated: "The informant, relaying statements Jose Angarita [("Angarita")] made after the murders, suggested that revenge and not robbery was the motive and that the incident that was revenged happened some years ago." The report also mentioned that in April 1984 Sergeant Kracht had interviewed Attorney Joseph DiLeonardo [("DiLeonardo")], who once

represented Angarita.  The police contacted DiLeonardo, Kracht's report explained, "because of statements attributed to him describing the murders of the Guerrero brothers as a contract killing."  At the interview, which was tape-recorded, DiLeonardo denied describing the murders as contract killings.  According to DiLeonardo, the mention of contract killings came from Santa Clara Police Department Sergeant Tom Hensley, who was preparing a case against one Ronnie Nance, who was then in the Santa Clara County Jail charged with the attempted armed robbery of a drug trafficker.

In opposing the August 1985 defense motion for disclosure of the confidential informant's identity, the prosecution asserted its evidentiary privilege not to reveal that identity, arguing that here the public interest in nondisclosure outweighed the necessity for disclosure. . . .  A hearing on that issue . . . was then held on September 6, 1985, in the chambers of Santa Clara County Superior Court Judge Read Ambler.  At that hearing, at which the defense was not present, the judge heard the testimony of two witnesses: Sandra Williams [("Williams")] and [Kesselman].

*In re Bacigalupo*, 55 Cal. 4th at 318-19.

At the hearing on the motion to disclose Kesselman's identity, Williams testified she learned about Kesselman during an interview with Nance, who was then in the Santa Clara County Jail awaiting trial on attempted murder and robbery charges.  Nance told Williams that Kesselman told him Angarita, who was Kesselman's former boyfriend, had information about the murders of the Guerrero brothers.  Williams sought Kesselman and Angarita, found them, and spoke to each of them separately.  Kesselman denied telling Nance that Angarita was involved in the murders, but disclosed that Angarita " 'was moving a lot of cocaine through Colombia into Florida,' and ultimately California, and that he knew murder victim Orestes Guerrero who had rented a small space in the back of Angarita's jewelry store in San Jose." *Id.* at 320.  Williams told the trial court that Kesselman previously turned over information which led to the federal drug prosecution against several defendants and was " 'being protected' " by the federal government.  *Id*.  Williams opined that the disclosure of Kesselman's identity would endanger Kesselman's life.

Kesselman was also called to testify.  Kesselman testified Angarita had been distraught over the death of his friend, Orestes Guerrero.  Angarita told Kesselman that Guerrero's's death was not just a robbery and that he learned about the details of the murder scene from his jewelry business partner, Dan Burke.  *See In re Bacigalupo*, 55 Cal. 4th at 320-21.  Kesselman told the trial court that Angarita's opinion that the killings were not actually a robbery stemmed from the

position of the bodies.  Angarita reportedly wondered:

> … if [the killer] was just some robber, how did that robber manage to kill both people within such a short amount of time, without, you know, being heard and escaping. So that's why [Angarita] was speculating, well, maybe it could have been—maybe it was a revenge killing.  Maybe it was a contract killing. . . .  He was only speculating.  He was wondering why someone, you know, if only the robber could be that fast or maybe there were two people.

*Id.*  Kesselman testified Angarita drew his conclusions from his knowledge of firearms and experience as a mercenary in Colombia.  Angarita did not mention having specific information that the murders were revenge or contract killings and Kesselman stated she had not personally formed an opinion as to the reason for the murders.  When asked whether Angarita might have known Petitioner, Kesselman testified Angarita did not " 'say one way or the other.' "  *Id.* at 321.

The trial court also listened to Kesselman's April 1984 interview with Kracht.  During the interview, Kesselman told Kracht that Angarita spoke to her about the deaths of the Guerrero brothers.  Angarita was " 'real excited' " and told Kesselman  he knew it wasn't a robbery despite the police theory that the killings were primarily a robbery.  *In re Bacigalupo*, 55 Cal. 4th at 321-22.  According to Angarita, the crimes were " 'an organized murder' " as a result of " 'something that happened years ago.' "  One of the victims was not supposed to be there and was not supposed to be killed.  *Id.* at 322.  Angarita also told Kesselman the murders were " 'professional' based on the positions of the bodies" and that another involved person was " 'already on [his] way back to New York.' "  *Id.*

Kesselman then told Kracht that she remembered previously driving Angarita to a hotel in San Francisco's Nob Hill neighborhood to meet a man Angarita described as a New Yorker and a " 'big' " Colombian drug dealer.  *In re Bacigalupo*, 55 Cal. 4th at 322.  The man, described by Kesselman as being in his mid-to-late thirties or younger, waited at the hotel entrance and then joined Angarita and Kesselman in their car.  The men had a brief conversation in Spanish, which Kesselman did not understand fully, as Kesselman drove around.  Kesselman stated that she was " 'almost positive' " Angarita called the man " 'Miguel.' "  *Id.*  She also told Kracht that she saw Petitioner's picture while she spoke to DA investigator Williams and thought he was " 'the same man that I had driven Jose [Angarita] to [meet] in San Francisco.' "  *Id.*

### 2. Kesselman's Declarations

Petitioner's second state habeas petition included three declarations from Kesselman. The first declaration stated that Kesselman testified during the *in camera* hearing in Petitioner's capital case. Kesselman stated that she also testified in a federal drug prosecution which resulted in convictions, but she declined the Drug Enforcement Agency's offer to place her in its witness protection program because she did not perceive any threat to her personal safety. *See In re Bacigalupo*, 55 Cal. 4th at 323.

Kesselman's second declaration contained information about Angarita's cocaine smuggling and dealing activities. It also repeated Kesselman's recollection that, in late December 1983, Angarita asked her to drive him to San Francisco to meet someone, later identified as Petitioner. Angarita described Petitioner as a New York drug dealer and told Kesselman that Petitioner would work for him. Kesselman drove Angarita to San Francisco, where they were supposed to meet Petitioner near a hotel, but had trouble finding the correct one. Finally, they found the correct hotel and picked up Petitioner. He was wearing casual attire and appeared " 'nervous and out of place.' " *In re Bacigalupo*, 55 Cal. 4th at 323. Angarita and Petitioner sat in the back seat of the car, conversing in Spanish, which Kesselman could not understand fully. Nevertheless, Kesselman thought Angarita was " 'obviously discussing some kind of business arrangement with [Petitioner].' " *Id.*

Within a few days of the San Francisco meeting, Kesselman heard that two Peruvians, the Guerrero brothers, were killed in their jewelry shop in San Jose. According to Kesselman, Angarita began acting strangely. He seemed nervous and would literally sweat when he watched reports of the murders on television. Angarita told her the Guerrero brothers previously worked in his jewelry shop because he had " 'an obligation to set them up in a store,' which he considered 'a burden.' " *In re Bacigalupo*, 55 Cal.4th at 323. Kesselman began suspecting that Angarita may have been ordered to kill the Guerrero brothers. Angarita had previously stated that " 'if people crossed him[,] . . . their whole family would be killed." *Id.*

Kesselman also provided details about her conversations with Williams regarding Petitioner's case. Kesselman stated she told Williams " 'everything' " contained in her declaration

and that Williams told her not to mention " 'the possibility that the Guerrero brothers' murders were contract hits ordered by [Angarita]' " during the *in camera* hearing. *In re Bacigalupo*, 55 Cal.4th at 323-24.

In May 2001, Kracht, who was then an investigator for the California Department of Justice, interviewed Kesselman regarding the aforementioned declarations. Kracht asked Kesselman to point out any inaccuracies in the declarations, to which Kesselman responded that Williams never told her to lie to the trial court regarding " 'the possibility that the Guerrero brothers' murders were contract hits ordered by [Angarita]' " *In re Bacigalupo*, 55 Cal.4th at 323-24. Kracht also showed Kesselman a photographic lineup which included Petitioner's photo, taken shortly after the murders, and five other Latino men in his age range at the time. Kesselman said she was not sure and went on to pick out a photo other than Petitioner's. The state submitted Kracht's 2001 interview transcripts after the California Supreme Court issued an order to show cause.

In response to the state's submission, Kesselman provided a third declaration. There, Kesselman stated that everything she mentioned in her previous declarations on behalf of Petitioner was "accurate and true." *In re Bacigalupo*, 55 Cal. 4th at 324.

### 3. Reference Hearing

In response to Petitioner's second state habeas petition, the California Supreme Court issued an order of reference to hold an evidentiary hearing and resolve several factual issues arising out of Petitioner's allegation that the prosecution committed misconduct and impaired Petitioner's ability to present mitigation during the penalty phase of trial. *In re Bacigalupo*, 55 Cal. 4th at 325.

The California Supreme Court directed the state referee to collect testimony and make factual findings as to several questions relating to whether the prosecution suppressed information supporting Petitioner's assertion that the Colombian Mafia had ordered him to kill the Guerrero brothers and whether the prosecution withheld information from the trial court during the hearing on Petitioner's motion to reveal Kesselman's identity. The Court will summarize the state referee's relevant findings, which were accepted by the California Supreme Court as "supported

8

by substantial evidence." *See In re Bacigalupo*, 55 Cal. 4th at 334.

### a) Evidence Adduced at the Hearing

According to Kesselman, Angarita was a large-scale drug trafficker with connections to the Medellin drug cartel, which was known for its violence. *See* Appx. A, Exh. 7, "Ref. Rep." at 23. Angarita, whose first wife was related to Pablo Escobar, was considered "very powerful" as a drug trafficker. Kesselman described once traveling to Los Angeles with Angarita to drop off a $250,000 cash payment for Escobar.

Kesselman testified that, on the night before the Guerrero brothers' murder, Kesselman, Angarita, and Luis Laureano[4] drove to San Francisco to meet a man named Miguel, later identified by Kesselman as Petitioner. *See* Ref. Rep. at 20. Kesselman, Angarita, and Laureano circled the block around the hotel until they saw Petitioner. Petitioner joined Angarita in the back seat of the car and Kesselman drove around the block while Angarita and Petitioner quietly conversed in Spanish for approximately five minutes. Laureano was in the front passenger seat and did not participate in or overhear the conversation. Kesselman dropped Petitioner back at the same hotel at approximately 2:00 a.m. and drove back to San Jose. *See* Ref. Rep. at 21.

Angarita initially told Kesselman that Petitioner was a new supplier who flew in from New York. According to Angarita, Petitioner was to supply "10 kilos a week" and was to attend a 2:00 p.m. meeting in San Jose the next day, the day the Guerrero brothers were killed. *See* Ref. Rep. at 20. On the day of the murders, however, Angarita asked Kesselman whether she saw a news story about the murders in which they showed "Miguel," whom Kesselman had seen the night before. Angarita then disclosed to Kesselman that Petitioner was there to kill the Guerrero brothers, who stored drugs and money for him in their jewelry store and had lost a large amount of Angarita's cocaine. *See* Ref. Rep. at 8-9. Angarita described the Guerrero brothers' murder as a contract killing arising out of a "South American vendetta," and told Kesselman that he did not carry out the murders, but the murders were carried out with his cooperation. Angarita said his

---

[4] Laureano was a member of Angarita's drug trafficking organization. The state referee considered significant evidence related to whether Laureano was present during the San Francisco meeting and held that evidence supported Laureano's testimony that he was there. (*See* Ref. Rep. at 10).

Colombian associates had ordered him to assist Petitioner.

Angarita subsequently expressed grief and remorse for being involved with the murders and became extremely paranoid. Angarita began carrying a handgun. Upon learning the Guerrero brothers had eleven children between them, Angarita wanted to set up a fund for the children. Angarita also cried in front of Kesselman on the day of the Guerrero brothers' funeral. Later, Angarita began fearing he was being targeted for the murders by local law enforcement and the Guerrero brothers' family, who had accused Angarita of the killings. Angarita told Kesselman he needed to leave the area and return to Colombia because things were "too hot" in San Jose, and he and Laureano stopped trafficking drugs. *See* Ref. Rep. 10.

Sometime after Kesselman and Angarita ended their relationship, Kesselman, while having drinks with Nance and Steve Price ("Price"), told them the Guerrero brothers' murder was not a robbery, but a "hit."[5] *See* Ref. Rep. at 12. One of the brothers worked for Angarita and had been "ripping off the jewelry" or cocaine, leading Angarita to "hire[] a second person to take care of it." *See* Ref. Rep. at 12 & 22. Kesselman also told Nance only one brother was supposed to be killed, but because the other brother was present during the incident, both brothers were killed. Some jewelry was then taken as a way to mask the "hit." *See* Ref. Rep. at 12. Nance later told investigators Petitioner said he was forced to carry out the murder for the Colombian Mafia because they had threatened to kill his parents.[6] The man who allegedly contacted Petitioner to set up the "hit" was Tigiboy. *See* Ref. Rep. at 14.

According to one of McCurdy's reports, DA investigators discovered Tigiboy was linked to Angarita's drug trafficking operation. No direct connection was made between Tigiboy and the Colombian Mafia. However, Petitioner indicated to one of his post-conviction experts that his brother had been murdered in New York by drug dealers from a Colombian mob, and that he believed those same people had ordered him to kill the Guerrero brothers. *See* Ref. Rep. at 28.

---

[5] Williams became aware of Nance after Nance, Kesselman, and Price planned and attempted to rob the home of one of Angarita's cousins.

[6] The defense had this information.

10

Laureano was never interviewed by the prosecution. He was the defendant in the federal drug case in which Kesselman testified. Laureano testified at the state reference hearing that he accompanied Kesselman and Angarita to San Francisco on the night before the Guerrero brothers' murders, provided ample detail about Angarita's drug trafficking operation, as well as Angarita's temper and propensity for violence, and, most notably, testified about a conversation he and Petitioner had prior to the killings. *See* RH 3402-3555. According to Laureano, Petitioner went to Laureano's work and told Laureano that Angarita told Petitioner to "do a job for him." *See* RH 3555. If Petitioner failed to carry out the job, Angarita threatened to kill Petitioner's family members, beginning with his mother. As he spoke, Petitoner's "eyes filled with tears and [Laureano] told [Petitioner] not to do it." *See id.* Laureano never saw Petitioner again.

### b) Prosecution Team's Knowledge

According to the referee, the prosecution obtained, before and during trial, information connecting the Guerrero brothers' murder to Angarita and Angarita's drug trafficking operation. The prosecution had information that Angarita ordered the homicides, which Angarita told Kesselman were drug-related revenge killings or contract hits on behalf of a South American drug cartel arising out of a dispute about an old drug debt. "Jose Angarita . . . told [Kesselman] about his own role in the murders, namely that he was . . . an instrument to the murders. The prosecution also had information from [Kesselman], based on [Kesselman's] personal knowledge, of a meeting in San Francisco the night before the murders between petitioner and Jose Angarita." *See* Ref. Rep. at 6. Members of the prosecution team were also aware the victims' brother claimed Angarita was responsible for the murders, and that the jewelry stores were used to move drugs.

The majority of the information connecting Angarita to the murders came from Kesselman. She told members of the prosecution team what Angarita allegedly told her as well as recounting her own observations of Angarita. The prosecution also obtained information connecting the Guerrero brothers' murder to Angarita through Nance and DiLeonardo, although DiLeonardo later denied making such statements and said only that Nance and Angarita had contacted him in reference to the drug trafficking business records which were seized following Nance's attempted robbery of the home of one of Angarita's cousins.

11

Kesselman testified she met repeatedly with Williams and members of the Drug Enforcement Agency ("DEA"), where they spoke about the Guerrero brothers' murders and a drug case involving Angarita's drug trafficking operation. *See* Ref. Rep. at 7-8. Kesselman stated that the meetings made it appear as if "Sandra Williams and the DEA were all in 'one basket' and interrelated." *See* Ref. Rep. at 8. Kesselman, DiLeonardo, and Nance also met with other members of the prosecution team, including McCurdy and Kracht, who sometimes memorialized conversations in their reports. Williams acted as a conduit between the various law enforcement agencies and the Santa Clara District Attorney's Office. *See* Ref. Rep. at 7.

In its report, the state referee noted several passages from prosecution team members' notes, reports, and interviews indicating that the Guerrero brothers' murders were drug-related contract killings, connected to Angarita, or both. *See* Ref. Rep. at 9-16. Williams and McCurdy gave a presentation reporting that Angarita had been Orestes Guerrero's former employer, connecting Angarita to drug trafficking, and tentatively associating Petitioner with Angarita on the evening before the murders. *See* Ref. Rep. at 23. The referee also noted that McCurdy "investigated . . . Tigiboy and determined he was not a high class drug dealer. However, his investigation discovered a link between Tigiboy and Jose Angarita, 'who was thought to be a dope dealer.'" *See* Ref. Rep. at 14.

In addition, Williams interviewed Angarita when he voluntarily went to the police department after being confronted by one of the victims' brothers. The brother had accused Angarita of the murders. *See* Ref. Rep. at 15. Angarita denied knowing anyone named "Miguel," but admitted he knew Laureano. The interview did not establish any connection between Angarita and the murders, but after receiving information regarding Angarita's Colombian heritage and drug trafficking operation, Williams and McCurdy apparently became "proponents of the theory that . . . Angarita was the kingpin, the 'shot-caller' behind the double homicides." *See* Ref. Rep. at 15. At the reference hearing, Williams "discounted and/or denied any drug connection to the killings." *See* Ref. Rep. at 17. The state referee, however, found that Williams' testimony was belied by her and her colleagues' notations of the homicide investigation, and accordingly determined her testimony on that point was not credible. *See* Ref. Rep. at 17.

12

The state referee found that "[f]or all practical purposes, i.e., with the exception of the information in [two reports prepared by Kracht and McCurdy], none of the information from [Kesselman], Nance or DiLeonardo . . . was given to the defense. The prosecution through Sandra Williams affirmatively told the defense that the information the defense had about any putative connection between the killings and a drug-related contract hit was not correct." *See* Ref. Rep. at 19.

### III. LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 340 (2003). Review under § 2254 is limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011); *see also* § 2254(d)(2).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and distinct meanings. *See Williams v. Taylor*, 529 U.S. at 404. A state court decision is "contrary to" Supreme Court authority and thus falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.*

13

at 413. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied. *See Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003) (overruled on other grounds in *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)).

On habeas review, the court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409; *see Harrington v. Richter*, 562 U.S. 86, 101 (2001) (" '[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law'") (emphasis in original) (citations omitted) (internal quotation marks omitted). Accordingly, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 88 (citing *Yarborough v. Alvarado*, 541 U.S. 653, 664 (2004)). "While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a great[] degree of deference to the state courts." *Clark v. Murphy*, 331 F.3d at 1068.

Similarly, on habeas review, a state court's factual determinations are accorded deference. *See Pinholster*, 563 U.S. at 180-81. A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding," and is presumed correct absent clear and convincing evidence to the contrary. *Miller-El I*, 537 U.S. at 340, *see* § 2254(e)(1).

When a federal court is presented with a state court decision that is unaccompanied by a rationale for its conclusions, the court has no basis other than the record "for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds in *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). In such situations, federal courts must conduct an independent review of the record to determine whether the state court decision is objectively unreasonable. *Id.* "[T]he habeas petitioner's burden still must be met by showing there was no

reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

Further, even if a petitioner meets the requirements of § 2254(d), habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) ("*Brecht*") (citations omitted) (internal quotations omitted). Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Brecht*, 507 U.S. at 637 (citing *United States v. Lane*, 474 U.S. 438, 439 (1986)).

## IV.     ANALYSIS

### A.  Duress Instruction: Claim A

In Claim A, Petitioner contends the trial court erroneously refused to instruct the jury that duress could negate the mental states necessary for a first-degree murder conviction and violated Petitioner's right to due process when it barred defense counsel from arguing that Petitioner did not premeditate and deliberate in part because of the threats and menaces against him and his family. *See* Fed. Pet. at 27 & 33-34. Petitioner also argues the trial court's decision barring counsel from arguing duress violated Petitioner's Sixth Amendment right to counsel. *See* Fed. Pet. at 32-33. Respondent argues Claim A is *Teague*-barred[7] and, in any event, reasonably denied by the California Supreme Court. *See* Answer at 7.

#### 1. *Teague*

Whether a federal court is obligated to apply the *Teague* rule is a threshold question in every federal case in which a respondent properly raises the issue. *See Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). Accordingly, the Court must first determine whether *Teague* applies to Claim A.

In *Teague*, the Supreme Court held "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague*, 489 U.S. at 310. "In general, . . . a case announces a new rule when it breaks new ground

---

[7] *Teague v. Lane*, 489 U.S. 288 (1989) ("*Teague*").

or imposes a new obligation on the State or the Federal Government." *Id.* at 301; *see id.* ("a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final"). The new rule principle does not, however, foreclose the specific application of a previously established rule. The Supreme Court has explained that "if the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule." *Williams*, 529 U.S. at 383 (quotation and citation omitted). District courts may look to circuit precedent to ascertain whether a rule has been established by the Supreme Court. *See Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

To determine whether a habeas petitioner is entitled to the application of a particular rule, a district court must consider the following: (1) the date on which the petitioner's conviction became final; (2) whether the rule is new; and (3) if so, whether the rule falls within one of *Teague*'s exceptions. *See O'Dell v. Netherland*, 521 U.S. 151, 156. *Teague* has two narrow exceptions, one relating to the criminalization of private, non-criminal behavior and the other relating to "those procedures that . . . are 'implicit in the concept of ordered liberty." *Teague*, 489 U.S. at 311.

Respondent contends that, to the extent Claim A alleges instructional error in failing to instruct jurors on lesser culpable forms of homicide, and to the extent Petitioner argues he is entitled to an instruction on what amounts to an affirmative duress defense, the claim is barred by the non-retroactivity doctrine set forth in *Teague*. *See* Answer at 11. Petitioner argues Claim A does not rely on the trial court's failure to instruct on lesser offenses or an affirmative duress defense and is therefore not barred by *Teague*. *See* Pet. Reply at 5-7.

The Court agrees with Petitioner that Respondent's *Teague* argument as to instructions on lesser culpable forms of homicide is inapposite in the context of Claim A, as Petitioner does not argue he was entitled to an instruction on a lesser offense.

Respondent's second argument, that the constitutional right to present an affirmative defense under state law is a "new" rule, also fails. The Ninth Circuit has long recognized that, " '[a]s a general proposition, a defendant is entitled to an instruction as to any recognized defense

16

for which there exists evidence sufficient for a reasonable jury to find in his favor.' " *Bradley v. Duncan*, 315 F.3d 1091, 1098 (9th Cir. 2002) (citing *Mathews v. United States*, 485 U.S. 58, 63 (1988) and *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see also United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir. 1990) (overruled in part on other grounds in *Dixon v. United States*, 548 U.S. 1 (2006)) ("A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence"). Petitioner's conviction and sentence became final when the Supreme Court denied certiorari for his direct appeal in 1994, *see Bacigalupo v. California*, 512 U.S. 1253. The relevant constitutional rule has been confirmed by circuit precedent at least as far back as 1990. The Court therefore concludes relief would not be barred by *Teague*'s non-retroactivity doctrine.

To the extent Respondent relies on *Gilmore v. Taylor*, 508 U.S. 333 (1993), his reliance is misplaced. In *Gilmore*, the petitioner argued that an ambiguous jury instruction regarding an affirmative defense[8] violated his constitutional right to due process. The Seventh Circuit granted the petitioner relief based on its own decision in *Falconer v. Lane*, 905 F.2d 1129 (7th Cir. 1990), which was decided after the petitioner's conviction became final, and held the rule announced in *Falconer* was not "new" for purposes of *Teague* because it was "compelled" by earlier Supreme Court precedent, *Gilmore*, 508 U.S. at 338-39. The Supreme Court disagreed, namely because many of the petitioner's cited cases invoked "the principle that the Constitution guarantees defendants a meaningful opportunity to present a complete defense. . . [but] dealt with the exclusion of evidence or testimony of defense witnesses. None of them involved restrictions imposed on a defendant's ability to present an affirmative defense." *Id*. at 341-42. The Supreme Court therefore concluded that, because the result in *Falconer* was not "foreordained" by the cited Supreme Court precedent and the *Falconer* rule was announced after the petitioner's conviction became final, the *Falconer* rule was "new" for purposes of *Teague*. *Gilmore*, 508 U.S. at 344-45.

Respondent argues that the Supreme Court's reasoning applies here. The Court concludes

---

[8] The jury instruction at issue did not place a burden on the prosecution to disprove, beyond a reasonable doubt, a defendant's affirmative defense that he had a "mitigating mental state." *Gilmore*, 508 U.S. at 339.

otherwise. In contrast to *Gilmore*, as noted above, Petitioner's claim that he was entitled to a jury instruction on his defense theory is supported by circuit precedent decided before Petitioner's conviction became final and is therefore not "new" for purposes of *Teague*.

Accordingly, the Court concludes Claim A is not barred by *Teague*.

### 2. Legal Standard

A state trial court's failure to give an instruction does not alone raise a ground cognizable in federal habeas corpus proceedings. *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). In order to obtain federal relief on an instructional error, the error must so infect the trial that the resulting conviction violates due process. *See id*.

Due process requires that " 'criminal defendants be afforded a meaningful opportunity to present a complete defense.' " *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). As a result, a criminal defendant is entitled to adequate instructions on the defense theory of the case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnapping where such instruction was supported by evidence).

A defendant is entitled to an instruction on his defense theory only "if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." *United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009) (quotation omitted). Moreover, a defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory, *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996), nor is a defendant entitled to an instruction embodying the defense theory if the evidence does not support it, *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an " 'especially heavy burden.' " *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997). The significance of such an omission may be evaluated by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001).

18

### 3.  Analysis

Petitioner makes several arguments in support of Claim A.

First, Petitioner argues the trial court committed a due process violation when it refused to give the jury his requested "duress" instruction that "threats or menaces may be a factor or circumstance to be taken into consideration to see whether or not certain elements of . . . homicide have been met," *see* Fed. Pet. at 29 (quoting RT 3472), which he contends was his theory of defense.  *See* Fed. Pet. at 32.

The California Supreme Court rejected Petitioner's claim on direct appeal, stating:

> Immediately after his arrest, defendant talked to Officer Reyes after waiving his constitutional rights under *Miranda v. Arizona*, *supra*, 384 U.S. 436, 479.  At first, defendant denied his involvement in the jewelry store incident, but later he admitted killing the Guerrero brothers.  Defendant made vague references to a group he called the "Colombian Mafia," [at trial referred to as the "Peruvian Mafia,"] which he said had "contracted" him to commit the double murder and threatened to kill him and his family if he did not do so.  Defendant said he was to turn the stolen jewelry over to the Colombian Mafia in New York.

> At trial, Officer Reyes testified to defendant's admissions made about the killings and defendant's comments about the Colombian Mafia.  Defendant did not testify.

> The prosecution offered alternative theories to support defendant's guilt of first degree murder: the killings were premeditated and deliberate, and they occurred in the course of a robbery.  (§ 189.) The trial court instructed the jury on both of these theories.  At the prosecution's request, the court also instructed the jury on the defense of duress as defined in CALJIC No. 4.40 (4th ed. 1979, bound vol.; unless otherwise indicated, all further references to CALJIC are to this edition), and it gave a modified version of CALJIC No. 4.41,[] informing the jury that duress was not a defense to a charge of homicide.

> The defense acknowledged that duress would not be a complete defense to murder, but argued that it should reduce criminal culpability by negating the ability to premeditate and deliberate.  Accordingly, defense counsel requested the court to instruct the jury on this theory of duress and to give an additional instruction on manslaughter. Counsel also asked for permission to argue this theory to the jury.  The court denied each of these requests.

> Defendant contends that the trial court erred in refusing to instruct the jury that duress could negate the elements of premeditation and deliberation, and that the court's ruling denied him the effective assistance of counsel by improperly limiting counsel's argument to the jury.  Defendant posits that the threats of harm would negate the mental states necessary for first degree murder, thereby reducing his

criminal culpability either to second degree murder (see Lafave & Scott, Criminal Law (1st ed. 1972) § 49, p. 379 [suggesting that duress may eliminate the ability to deliberate or premeditate]) or to manslaughter (Lafave & Scott, Criminal Law (2d ed. 1986) § 7.11(c), pp. 666-667 [duress may negate malice thereby reducing murder to manslaughter]). As we shall discuss, the facts of this case do not support the instruction that defendant requested.

A trial court need only give those requested instructions supported by evidence that is substantial. (*People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12.) Central to a defense of duress is the immediacy of the threat or menace on which the defense is premised. (*People v. Quinlan* (1970) 8 Cal.App.3d 1063, 1068; *People v. Pic'l* (1981) 114 Cal.App.3d 824, 869, disapproved on other grounds in *People v. Kimble* (1988) 44 Cal.3d 480, 498.) "[A] phantasmagoria of future harm," such as a death threat to be carried out at some undefined time, will not diminish criminal culpability. (*People v. Otis* (1959) 174 Cal.App.2d 119, 125; *People v. Lewis* (1963) 222 Cal.App.2d 136, 141.)

Here, defendant's vague and unsubstantiated assertion in his statement to Officer Reyes—that the Colombian Mafia had threatened to kill him and members of his family if he did not kill the Guerrero brothers—did not constitute substantial evidence that the threat of death to defendant and his family was imminent.

*People v. Bacigalupo*, 1 Cal. 4th at 123-25.

The Court cannot find that the California Supreme Court's conclusion that Petitioner did not show he was legally entitled to a duress instruction under California law was unreasonable. *See Williams*, 529 U.S. at 413. Petitioner does not appear to dispute that the evidence showed no threat of imminent harm and, most importantly, does not dispute that duress is not a legally cognizable defense to murder under California law. *See* Fed. Pet. at 28; *see also People v. Anderson*, 28 Cal.4th 767, 784 (2002). The California Supreme Court therefore had a reasonable basis to deny his claim.

Petitioner instead argues the California Supreme Court's characterization of his statement as a "vague and unsubstianted assertion" constituted an improper credibility determination and that he need not show an imminent threat because he was not seeking to present duress as an affirmative defense, but rather sought only to instruct the jury it could consider the threats made to him and his family in determining whether the prosecution established deliberation and premeditation. *See* Traverse at 7. The California Supreme Court also rejected this argument, stating:

Without bestowing merit on defendant's theory that duress can negate premeditation and deliberation, we simply hold that in the absence of substantial evidence of immediacy of the threatened harm, the trial court did not err in refusing defendant's proffered instructions. Consequently, defendant was not denied the effective assistance of counsel when, as a result of the court's ruling, defendant was precluded from presenting to the jury a theory of defense unsupported by the evidence.

Moreover, by finding the alleged robbery special circumstance to be true, the jury necessarily decided that the murders were committed in the course of a robbery. (§§ 189, 190.2, subd. (a)(17)(i); *People v. Garrison* (1989) 47 Cal.3d 746, 779.) For this reason, the murder verdicts are not dependent on findings that the killings were deliberate or premeditated. Thus, any error by the trial court in refusing the requested instructions, which pertained only to murder premised on deliberate and premeditated conduct, was harmless. (*People v. Sedeno* (1974) 10 Cal.3d 703, 721.) Ex. A9 at 11-15 (footnote omitted).

*People v. Bacigalupo*, 1 Cal. 4th at 123-25.

Petitioner has not shown that the California Supreme Court's rejection of this argument was objectively unreasonable under the circumstances. California law holds that, while a killing under duress can lack premeditation and deliberation, "this circumstance is not due to a special doctrine of duress but to the legal requirements of first degree murder." *People v. Anderson*, 28 Cal.4th at 784. Accordingly, the California Supreme Court's denial of Petitioner's claim that he was entitled to a modified duress instruction—despite the fact that duress is not a defense to first-degree murder and that Petitioner did not show he would have otherwise been entitled to a duress instruction—was not unreasonable under state law and, in any case, does not show a denial of due process. *See United States v. Del Muro*, 87 F.3d at 1081 (holding defendant not entitled to precise wording on instructions if other instructions adequately embody theory of defense). As noted, the significance of the omission of a proffered instruction may be evaluated by comparison with the instructions that were given, *Murtishaw v. Woodford*, 255 F.3d at 971, and the jury instructions given during Petitioner's trial show that the jury was instructed that the prosecution had the burden of proving deliberation and premeditation and that evidence of "the circumstances surrounding the commission of the act" was relevant to whether the prosecution proved the intent elements for the charged crimes. *See* CT 406.

For example, the trial court instructed the jury on malice aforethought and deliberate and premeditated murder, noting that "if [the jury found] the killing was preceded and accompanied by

21

a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and *not under a sudden heat of passion or other condition precluding the idea of deliberation*, it [was] murder in the first degree." *See* CT 593 (emphasis added). The trial court further instructed the jury that, "[t]o constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to kill." *See* CT 594. In addition, the jury was instructed that they "may not find the defendant guilty of the offense charged in the information unless the proved circumstances not only are consistent with the theory that he had the required (specific intent) (or) (mental state) but cannot be reconciled with any other rational conclusion." *See* CT 406.

Petitioner points to the trial court's instruction that it was not "a defense to a charge of homicide that the defendant committed the act or made the omission charged under threats and menaces of immediate death or bodily harm," *see* CT 413, and argues the instruction effectively left the "jury with clear direction not to consider the threats and menaces in relation to the homicide counts." *See* Traverse at 7-8.[9] It appears, however, that the trial court gave the jury instruction at issue after it instructed the jury on duress for the charged crimes other than homicide. The instructions correctly stated that while, under some circumstances, "[a] person is not guilty of a crime when he engages in conduct, otherwise criminal, when acting under threats and menaces," such defense is not applicable to a charge of homicide. *See* CT 412. Contrary to Petitioner's assertion, the instruction at issue in no way directs the jurors not to consider whether the circumstances surrounding the commission of the killings, including any threats to Petitioner and his family, in determining whether the prosecution had shown Petitioner deliberated and premeditated the killings. Under the circumstances, the Court concludes Petitioner has not shown the trial court's failure to give Petitioner's requested instruction, and decision to instruct the jury that duress was not a defense to homicide, violated due process. *See Walker v. Endell*, 850 F.2d at

---

[9] Petitioner argues the instruction amounted to an affirmative misstatement of the law. However, the instruction, is a correct statement of California law. *See Anderson*, 28 Cal.4th at 785 (holding "duress is no defense to murder").

476 (habeas petitioner is not entitled to federal habeas relief unless " 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' ").

Petitioner also argues the trial court committed error and violated due process and his Sixth Amendment right to counsel when it barred counsel from arguing Petitioner's theory of defense during closing. The Court concludes trial error appears likely. Defendants have a right to argue a legitimate theory of defense, as long as it is within the issues pertaining to the case, during closing argument. *See Herring v. New York*, 422 U.S. 853, 860 (1975) (" 'The Constitutional right of a defendant to be heard through counsel necessarily includes his right to have his counsel make a proper argument on the evidence and the applicable law in his favor' "). Here, the trial court and California Supreme Court found that trial counsel's request to argue that the threats precluded Petitioner's ability to deliberate was properly denied because Petitioner failed to show immediacy of the threats made against him. In the years following the denial of Petitioner's claim, however, the California Supreme Court has explicitly recognized that a jury may consider whether "threats—or any other facts—prevented [a] defendant from premeditating and deliberating." *People v. Hinton*, 37 Cal.4th 839, 883 (2006); *see Anderson*, 28 Cal.4th at 784 ("[A] killing under duress, like any killing, may or may not be premeditated, depending on the circumstances. . . not due to a special doctrine of duress but to the legal requirements of first degree murder"). If tried today, Petitioner would therefore be entitled to argue that the threats made against him and his family prevented him from premeditating and deliberating his crimes. Moreover, while *Anderson* and *Hinton* are relatively new cases, the jury instructions given during Petitioner's trial make clear that a defendant is entitled to have a jury consider "condition[s] precluding the idea of deliberation" when determining whether a killing was premeditated and deliberated. *See* CT 593. Accordingly, the existence of threats would arguably have been relevant to this inquiry even before *Anderson* and *Hinton* explicitly noted as much in 2002 and 2006, respectively.

However, even assuming arguendo that Petitioner has sufficiently shown the California Supreme Court erred in holding that Petitioner needed to show that the threat of harm was imminent, Petitioner nevertheless has not shown that the error was unreasonable for purposes of § 2254(d) or, most importantly, that the error was prejudicial. *See Glebe v. Frost*, 135 S. Ct. 429,

430-32 (2014) (holding trial error limiting defense counsel's summation may be found harmless). Trial counsel was not barred from arguing that the prosecution failed to show deliberation and premeditation, and, despite the trial court's limitations, trial counsel admitted he was able to argue that "there might be some pressures upon [Petitioner] that would affect his deliberative processes." *See* RH at 995. Under these circumstances, the Court concludes Petitioner has not shown the trial court's decision not to allow trial counsel to explicitly argue that the threats prevented Petitioner from deliberating or premeditating the crimes amounted to a violation of due process or Petitioner's right to counsel. *See Dunckhurst v. Deeds*, 859 F.2d at 114.

Based on the aforementioned, Petitioner has not shown rejection of this claim resulted in a decision that involved an unreasonable application of clearly established federal law. *Richter*, 562 U.S. at 88; 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief based on Claim A. The Court will determine whether the error identified in this claim was prejudicial in the context of cumulative error in Claim L.

## B. Ineffective Assistance of Counsel Claim: Claim B

In Claim B, Petitioner contends trial counsel unreasonably failed to adequately investigate and present psychiatric, medical, and neurological evidence and cultural, family, and personal background information that would have supported mental state defenses to guilt in violation of his rights to due process, a fair trial, present a defense, an unbiased jury, a jury trial, effective assistance of counsel, confrontation and cross-examination, and a reliable guilt and penalty[10] determination as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. *See* Fed. Pet. at 34.

Claim B was denied by the California Supreme Court in a summary opinion. *See* Exh. F14.

### 1. Expert declarations

In support of Claim B, Petitioner incorporated by reference the declarations of several

---

[10] Petitioner was originally under a sentence of death, but was resentenced to life imprisonment. Claim B contains various references to the death penalty and penalty phase of trial. *See* Fed. Pet. at 35, 41, & 43. Insofar as Petitioner argues in Claim B that the death penalty was not appropriate for his case, the argument is moot.

mental health, neurology, and cultural experts. *See* Fed. Pet. at 34-35. The Court briefly summarizes their declarations.

Renato Alarcon, M.D., Professor and Vice-Chair of the Department of Psychiatry and Behavioral Science at Emory University School of Medicine in Atlanta, Georgia, was contracted during habeas proceedings to evaluate Petitioner. *See* Appx. E, Exh. 15, at 4 ("Alarcon Decl."); *see also* Fed. Pet. at 24. Dr. Alarcon's declaration explores, at great length, Petitioner's background, family history, history with law enforcement and institutionalization, Peruvian history and cultural practices, Peruvian and American racism and colorism. Petitioner and his family were born in Peru into a generational cycle of poverty, illness, and early deaths. *See* Alarcon Decl. at 5. Dr. Alarcon describes Petitioner as "an abused, brain-damaged and borderline intellectually functioning individual, who despite these serious deficits, was faced with the challenge of trying to adapt to four different countries and cultures while growing up." *See* Alarcon Decl. at 5. According to Dr. Alarcon, Petitioner "had extreme difficulties adapting to any of his environments, and the problems associated with the constant relocations compounded themselves as each failure severely limited his developmental process." *See* Alarcon Decl. at 6.

Jonathon H. Pincus, M.D., is a professor and Chairman of the Department of Neurology at the Georgetown University School of Medicine, and also evaluated Petitioner. Dr. Pincus found Petitioner's neurological history presented "strong indicia of neurological damage" as a result of abuse and malnutrition in-utero and during childhood, Petitioner's multiple head injuries as a young adult, and substantial drug use throughout his lifetime. *See* Appx. E, Exh. 49 at 8 ("Pincus Decl."). Petitioner exhibited signs of frontal lobe damage in five of the tests administered by Dr. Pincus. According to Dr. Pincus, serious frontal lobe damage produces "profound behavioral alterations in an individual," *see id*. at 14, and the use of alcohol and drugs exacerbate Petitioner's condition much more than in the average person. Dr. Pincus found that Petitoiner "is a severely impaired individual—not only does he suffer from serious brain damage, but he is also psychotic with delusions and most likely suffers from a serious mood disorder." *See id*. at 15. Dr. Pincus concluded Petitioner most likely suffered from his impairments during the commission of the crimes.

Dale Watson, Ph.D., who evaluated Petitioner in 1997, is a licensed psychologist in California. Dr. Watson administered a full battery of standard neuropsychological tests, conducted a mental status examination, and a clinical interview. Dr. Watson determined Petitioner had an I.Q. of 83 and, further, that Petitioner suffered from neurological damage, noting that Petitioner's performance on several neuropsychological tests indicated "moderate neuropsychological impairment." *See* Appx. E, Exh. 48 at 5 ("Watson Decl."). He also concluded Petitioner's test results indicated neurological dysfunction. *Id.* at 6.

Fred Rosenthal, M.D., Ph.D., specializes in clinical and forensic psychiatry. Dr. Rosenthal evaluated Petitioner and testified during Petitioner's state reference hearing. Dr. Rosenthal found that Petitioner had an I.Q. of 83 and agreed with Dr. Pincus's assessment that Petitioner displayed signs of brain damage, particularly in the frontal lobe, and concluded Petitioner suffered from severe mental problems. *See* RH at 2993-95. Dr. Rosenthal opined, based on Petitioner's I.Q. and brain damage, that Petitioner "would have difficulty reasoning in extensive ways about complicated ideas" and would be "vulnerable to influence." *See* RH at 2997. Dr. Rosenthal also opined that "the way [Petitioner] followed this man's demands and with the fear of reprisals and went ahead and [killed the Guerrero brothers] is consistent with his mental condition, that he would take a simple solution and not be able to think of alternatives, reasonable alternatives, to try to save himself." *See* RH at 3007-08.

### 2. Legal Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's

deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Deficient performance must be established by making a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment and that counsel's representation fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687-88. The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689.

"Although courts may not indulge '*post hoc* rationalizations' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, . . . neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.' " *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (citations omitted); *see also id.* at 110 ("an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities"). A petitioner must also show that counsel's errors were so serious as to deprive the defendant of a fair trial. *Strickland*, 466 U.S. at 688. Where a petitioner is challenging his conviction, the appropriate question is " 'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' " *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 694).

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Pinholster*, 563 U.S. 170, 190 (2011); *Richter*, 562 U.S. at 105 (same). The general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA."

*Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### 3. Analysis

Petitioner makes several arguments in support of Claim B.

Petitioner first argues counsel's failure to research psychiatric, medical, and neurological evidence and cultural, family, and personal background information, which would have helped mount defenses related to his mental illness, intoxication, brain damage, insanity, and duress, and/or cast doubt on the prosecution's evidence of premeditation and deliberation, constituted ineffective assistance of counsel. *See* Fed. Pet. at 34-45; *see also* Traverse at 20. Respondent argues Petitioner's claim fails because he failed to submit a declaration from trial counsel. *See* Answer at 22. Respondent also contends the claim fails on the merits.

The Court first notes that, while Petitioner did not attach a declaration from counsel, Petitioner submitted excerpts from trial counsel's testimony during the state reference hearing in which he is questioned about his trial strategy and Petitioner's defense. *See* RH 889, 924-25, & 2628-29. Trial counsel testified he thought Petitioner's "only defense" was one related to duress, but believed, "based upon all the evidence before [him] at the time, from the district attorney and the police reports and that sort of thing, . . . that th[e] whole business of Jose Angarita [was] a red herring and not worth pursuing." *See* Traverse at 18 (quoting RH 2628). Respondent's first argument is therefore unavailing.

Nevertheless, the Court concludes Petitioner has not shown the California Supreme Court unreasonably applied federal law or unreasonably determined the facts in denying his claim. *See Williams v. Taylor*, 529 U.S. at 404.

First, the California Supreme Court reasonably could have determined trial counsel conducted a reasonable investigation and made a tactical decision not to pursue a mental health or intoxication defense. As Respondent notes, there is evidence in the record suggesting trial counsel conducted some investigation into Petitioner's personal background and medical history. For

example, trial counsel alluded to Petitioner's medical records several times during trial, including when counsel asked a police officer about some head injuries Petitioner incurred in 1978 and when counsel asked a criminalist detailed questions about Petitioner's blood alcohol level at the time of arrest, which the criminalist estimated would have been .16%. *See* RT 3446-50; 3743-46.

In addition, trial counsel obtained and provided Petitioner's medical and personal history to an expert, Dr. John Brady, who then evaluated Petitioner, albeit in a manner less favorable than the evaluations Petitioner provides now. *See* RT 3866-3936.[11] Dr. Brady met with Petitioner prior to trial, administered several psychological tests, reviewed Petitioner's medical history, and diagnosed Petitioner with chronic depression. *See People v. Bacigalupo*, 1 Cal.4th at 120. He opined that Petitioner was not intellectually disabled, did not suffer from ongoing brain damage, and did not exhibit any obvious signs of psychosis. Dr. Brady also testified that he believed Petitioner could be rehabilitated through the penal system. *Id.*

While Petitioner's current experts disagree with Dr. Brady's diagnosis and testimony, there is no indication trial counsel believed that Dr. Brady was incompetent to render an opinion on Petitioner's mental health, nor has Petitioner shown counsel unreasonably relied on Dr. Brady's expertise. *See Knowles v. Mirzayance*, 556 U.S. at 125 (trial counsel not ineffective in rescinding insanity plea when his experts could be severely impeached for overlooking or minimizing facts inconsistent with their diagnoses). Based on the evidence in the record, the California Supreme Court reasonably could have concluded Petitioner failed to show counsel was ineffective in investigating Petitioner's personal background, mental and medical history, and intoxication following the crimes. *See Richter*, 562 U.S. at 89 ("The question under § 2254(d) is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard").

Even if Petitioner had established ineffectiveness, the California Supreme Court reasonably could have concluded Petitioner did not show "there is a reasonable probability that,

---

[11] Petitioner argues Brady's testimony is irrelevant because it was heard during his penalty phase of trial, but points to no evidence suggesting counsel did not conduct his penalty phase investigation before Petitioner's guilt phase of trial began.

but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The expert testimony now proffered by Petitioner contains detailed allegations about Petitioner's background and family history, but general mental health/brain damage allegations. The state referee summarized the expert testimony as showing that people with Petitioner's mental health issues and brain damage have "difficulty with thinking about complex ideas," and cannot "cope with different complexities." *See* Ref. Rep. at 27. The experts' testimony also alleges Petitioner generally "could not figure out what would be in his best interest and act independently." *See* Ref. Rep. at 27-28. Petitioner has not, however, identified how his experts' opinions show that Petitioner did not premeditate or deliberate his actions *at the time of the killings*. Petitioner's omission is crucial especially in light of the evidence of the circumstances surrounding the commission of the crimes, including that Petitioner obtained a gun from Tigiboy, spoke to Laureano, who advised Petitioner not to carry out the killings despite Angarita's threats, met with Angarita in San Francisco on the night before the killings, presumably to discuss the murders, rode the bus for an hour to the jewelry store to carry out the crimes, shot each victim in the head, and then repeatedly attempted to avoid or minimize blame while being interrogated by police following his arrest.

To the extent Petitioner argues his mental health issues and brain damage prevent him generally from premeditating or deliberating, Petitioner essentially attempts to raise a mental health defense, but, having cited no California law discussing requirements for such a defense, does not explain why he would have been entitled to raise such a defense. Petitioner's allegation that he would have been entitled to assert an intoxication defense fails for the same reason— Petitioner does not cite or explain California law surrounding requirements for an intoxication defense or explain why the evidence he has submitted would have entitled him to assert one, let alone explain why trial counsel could have had no strategic basis to forego such a defense. *See Strickland*, 466 U.S. at 689 (holding that judicial scrutiny of trial counsel's conduct must be deferential because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was

30

unreasonable"). Under these circumstances, the Court concludes the California Supreme Court reasonably could have held Petitioner failed to establish prejudice. *Harrington v. Richter*, 562 U.S. at 104 ("It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' ") (citation omitted).

Based on the aforementioned, Petitioner has not shown rejection of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. *Richter*, 562 U.S. at 88; 28 U.S.C. § 2254(d). Petitioner is not entitled to relief on Claim B.

## C. *Brady* Claims: Claims C & D

Petitioner brings two *Brady* claims, Claims C and D. The Court will address each in turn.

### 1. Legal Standard

In *Brady*, the Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution," *Brady*, 373 U.S. at 87, and subsequently clarified that the duty to disclose such evidence applies even in the absence of a request. *United States v. Bagley*, 473 U.S. 667, 683 (1985). Evidence is deemed favorable to the accused if it has either "exculpatory" or "impeachment" value. *Id.* at 676.

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.' " *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Kyles*, 514 U.S. at 434); *see, e.g., Wearry v. Cain*, 136 S. Ct. 1002, 1006-1007 (2016) (reversing, based on *Brady* violation, conviction where impeachment evidence as to key prosecution witnesses was suppressed; holding "[e]ven if the jury—armed with all of this new evidence—*could* have voted to convict [defendant], we have no confidence that it *would* have done so") (emphasis in original) (citations omitted) (internal quotations omitted). A reasonable probability of a total acquittal is not required to establish materiality; suppressed

1    evidence is material if, had it been disclosed, there is a reasonable probability the defendant would

2    have been convicted of a "different offense or a different degree of the crime." *Shelton v.*

3    *Marshall*, 796 F.3d 1075, 1085 (9th Cir. 2015), *amended on reh'g*, 806 F.3d 1011 (9th Cir. 2015).

4    Nevertheless, "evidence impeaching an eyewitness may not be material if the State's other

5    evidence is strong enough to sustain confidence in the verdict." *Smith v. Cain*, 565 U.S. at 75.

6    Moreover, the "mere possibility" that undisclosed information "might have helped the defense or

7    might have affected the outcome of the trial" does not establish materiality under *Brady*. *United*

8    *States v. Olsen*, 704 F.3d 1172, 1184 (9th Cir. 2013) (internal quotations and citations omitted).

9         In sum, for a *Brady* claim to succeed, a petitioner must show: (1) that the evidence at issue

10   is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was

11   suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material, i.e.,

12   that prejudice ensued.[12] *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S.

13   263, 281-82 (1999).

14        **2.   Analysis**

15            **i.   Claim C**

16        In Claim C, Petitioner contends the prosecution violated *Brady* and Petitioner's rights to

17   due process, fair trial, unbiased jury, effective assistance of counsel, to present a defense, to

18   confront and cross-examine, to a reliable determination of guilt, and to meaningful appellate

19   review as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States

20   Constitution by failing to disclose Kesselman's identity and statements. *See* Fed. Pet. at 45.

21   According to Petitioner, Kesselman's testimony would have supported Petitioner's statements to

22   police that the killings were the result of orders given by the Colombian Mafia and would have

23   undermined the prosecution's felony-murder and premeditation/deliberation murder theories. *See*

24   Fed. Pet. at 58.  Respondent contends Petitioner has not shown favorability or materiality because

25   Kesselman's pretrial interviews "contained no admissions by Angarita, and . . . no evidence to

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [12] For the purpose of review under *Brady*, " 'material' and 'prejudicial' have the same meaning."
28   *United States v. Kohring*, 637 F.3d 895, 902 n.1 (9th Cir. 2011).

support Petitioner's allegations of duress." *See* Answer at 51. Respondent also argues Petitioner

has not shown suppression because Kesselman's identity was "readily obtainable," *see id.* at 53,[13]

and because the prosecution tendered Kesselman's identity, statements, and testimony to the trial

judge during an *in camera* proceeding. *See* Answer at 52. The California Supreme Court denied

Claim C in a summary opinion issued following receipt of the state referee's findings.[14] *See* Exh.

F14.

As noted, to show a *Brady* violation, Petitioner must illustrate that the evidence at issue

was favorable to him, that it was suppressed by the prosecution, and that it was material. *Banks v.*

*Dretke*, 540 U.S. at 691.

Petitioner has shown that Kesselman's statements would have been favorable to him or, at

the very least, would have led him to other favorable evidence. The state referee found that

Kesselman

> supplied the prosecution with information . . . that Jose Angarita was instrumental in the
> murders [of the Guerrero brothers] and that they arose from a South American drug cartel.
> . . . Angarita told [Kesselman] in so many words that this was a contract killing. The
> murders were over an old drug debt between some other cartel members or family. Jose
> Angarita was ordered to assist this man who killed the Guerrero [b]rothers.

*See* Ref. Rep. at 23. Accordingly, Kesselman's statements would have provided the foundation

for evidence bolstering Petitioner's statement to police that he carried out the murder under threats

of death. Kesselman's testimony would have tied Angarita and Petitioner, connected Angarita and

the Guerrero brothers to the Medellin cartel, and provided circumstantial evidence that Angarita

was involved in the killings. Together, the evidence would have lent substantial credibility to

Petitioner's statement to police that he was threatened by the Columbian mafia. Moreover, one of

the prosecution's theories of guilt was that the killings were committed to cover up the

commission of a robbery, not because Petitioner was ordered to carry out the killings by the

---

[13] Citing *Rovario v. United States*, 353 U.S. 53 (1957), Respondent contends the trial court did not
err in its decision to deny Petitioner's motion to disclose Kesselman's identity and statements.
(*See* Answer at 44 & 46-47). The Court will address *Rovario* after it determines whether
Kesselman's statements were material.

[14] The claim was also denied on procedural grounds that are not binding on this Court.

1   Colombian mafia.  Kesselman's statements would have challenged the prosecution's narrative by

2   showing that "the motive [for the killings] was not robbery but revenge over a South American

3   drug debt."  *See* Ref. Rep. at 34.  .

4   Respondent also argues the information provided by Kesselman was speculative in nature.

5   *See* Answer at 51.  As discussed above, the state referee found, and the Court agrees, that the

6   record shows otherwise—Kesselman gave a firsthand account of the San Francisco meeting and

7   reported her firsthand observations of Angarita.  Thus, inasmuch as Kesselman's statements could

8   have potentially led to evidence undermining at least one of the prosecution's theories of guilt and

9   the prosecutions' narrative ridiculing Petitioner's assertion that he was threatened by the

10  Colombian mafia, Petitioner has shown favorability.  *See Bagley*, 473 U.S. at 683; *see* Ref. Rep. at

11  24 (finding that "[s]ince the DA painted [P]etitioner as a killer and a liar, the evidence [of

12  Kesselman's statements] would have been useful to rebut those claims"); *see also Milke v. Ryan*,

13  711 F.3d 998, 1012 (9th Cir. 2013) (holding "[a]ny evidence that would tend to call the

14  government's case into doubt is favorable for *Brady* purposes").

15  Respondent also contends Petitioner failed to allege suppression because if Kesselman's

16  statements were true, Petitioner should have known about the San Francisco meeting.  Respondent

17  likewise argues that Petitioner should have known Kesselman's identity, and that Kesselman's

18  identity was ascertainable through a series of clues found in other witnesses' statements.  *See*

19  Answer at 53-54.  Respondent's first assertion is correct insofar as Petitioner should have been

20  aware that he had a meeting with an individual in San Francisco on the night before the murders.

21  *See Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (holding no *Brady* violation where

22  "[p]etitioner possessed the salient facts regarding the existence of the [evidence]").  There is no

23  evidence in the record, however, indicating that Petitioner knew Kesselman's full name, nor is

24  there any evidence that Petitioner should have known about Kesselman's observations of

25  Angarita's statements regarding the reason for the "hits" of the Guerrero brothers or Angarita's

26  erratic behavior following the commission of the crimes.[15]  Consequently, even if Kesselman's

27

28  [15] Of note, it appears the defense looked into substantiating Petitioner's theory, but was actively
    misled by the prosecution team, which indicated to the defense that Angarita had no ties to drug

34

1    identity was known to Petitioner, the prosecution would have had a duty to disclose Kesselman's

2    statements, especially in light of the evidence that Kesselman was previously instructed by

3    Williams to lie and omit certain facts regarding her knowledge about the crimes and Angarita's

4    involvement in them. *See Brady*, 373 U.S. at 87; *see also* Ref. Rep. at 20-21.

5         As to Respondent's assertion that other sources turned over to Petitioner contained

6    information that could have led him to Kesselman's identity, *see* Answer at 53-54, the Court notes

7    that a state court's factual findings are presumed correct absent clear and convincing evidence to

8    the contrary, *Miller-El I*, 537 U.S. at 340, and the state referee found that the prosecution did not

9    turn over the materials cited by Respondent, i.e., DiLeonardo's taped interview, Nance's taped

10   interview, Kracht's notes discussing interviews with Kesselman, items related to Price, and all of

11   the information contained therein. *See* Ref. Rep. at 19. Of note, the state referee observed that its

12   finding that these items were never turned over to the defense was supported by "the fact that

13   neither the trial attorney, the appellate attorneys, nor the habeas attorneys ever saw the transcripts

14   or the recordings of these matters until years after [P]etitioner's trial had ended." *See id.* The state

15   referee then concluded that "the prosecutor's claim that these items individually or collectively

16   had been provided in discovery . . . have no basis in fact." *See id.* Given these findings, there is

17   no indication Petitioner could have discovered Kesselman's relevant statements using those

18   avenues.

19        Finally, Respondent argues that the prosecution satisfied its obligation under *Brady* when it

20   turned over Kesselman's interview to the trial court for the *in camera* proceeding, citing two cases

21   from the Sixth and Third Circuits. *See United States v. Todd*, 920 F.2d 399 (6th Cir. 1990);

22   *United States v. Dent*, 149 F.3d 180 (3d Cir. 1998). In *Todd*, the Sixth Circuit held that the

23   government met its *Brady* obligations despite not turning over several reports to the defendant.

24   The prosecution had notified the defense that two witnesses, whose names were known to the

25   defense, made statements exculpatory to the defendant. It also turned over the reports at issue to

26   the district court, which inspected the reports and found that the defendant already had access to

27

28   _____

     trafficking.

35

the information and witnesses at issue. The panel held that, "[g]iven this procedural safeguard, . . . the defendant's due process rights were protected adequately notwithstanding his inability to discover the FBI reports." *Todd*, 920 F.2d at 405.

In *Dent*, a defendant issued a subpoena for a law enforcement officer's personnel records after receiving information that the officer had committed misconduct on another case. The prosecution opposed the motion and the district court heard *in camera* testimony about the contents of the file. The trial court held that the information contained in the file was not exculpatory and, further, was not proper impeachment material. It subsequently denied the defendant's motion. The Eleventh Circuit upheld the trial court's denial of the motion and held that the "district court's *in camera* inspection of [the files at issue] fully satisfied *Brady*'s due process requirements." *Dent*, 149 F.3d at191.

Neither case is binding on this Court, and, in any case, the Court finds that both are distinguishable from the case at bar. As noted above, the state referee found that Petitioner did not have access to the information necessary to discover Kesselman's statements on his own. As a result, *Todd*'s rationale does not apply here. Moreover, *Dent* did not involve a situation in which the prosecutors actively misled the trial court during the *in camera* hearing. Here, the state referee found that "Williams was not truthful . . . [and that she] persuaded [Kesselman] into giving misleading and incomplete testimony at the *in camera* hearing." *See* Ref. Rep. at 33 (italics added). Accordingly, Respondent's assertion that the *in camera* hearing sufficiently safeguarded Petitioner's due process rights is disingenuous under the circumstances. Because the information presented to the trial court during the hearing was misleading and incomplete, the California Supreme Court could not reasonably rely on the findings made by the trial court during the *in camera* hearing in determining whether Petitioner showed suppression.[16]

---

[16] The Court notes that the California Supreme Court considered this argument as to Petitioner's penalty phase claims, but disregarded it after it found that the trial court's ruling as to the materiality of Kesselman's testimony was limited to the guilt phase. *See In re Bacigalupo*, 55 Cal.4th at 336. While Petitioner is not challenging the trial court's denial of his motion to disclose Kesselman's identity outright, a materiality finding as to the suppressed evidence would necessarily implicate the trial court's denial of his motion. The Court will consider materiality below.

36

The Court will consider the matter of materiality in conjunction with Petitioner's other claimed *Brady* errors in Claim D.

### ii. Claim D

In Claim D, Petitioner contends the prosecution violated *Brady* when it improperly withheld exculpatory information in violation of his rights to due process, fair trial, unbiased jury, effective assistance of counsel, to present a defense, to confront and cross-examine, to a reliable determination of guilt, and to meaningful appellate review as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. *See* Fed. Pet. at 78-79. Specifically, Petitioner contends the prosecution violated *Brady* when it suppressed statements made by DiLeonardo and Nance, and suppressed information that Angarita was a suspect as well as other evidence associating Petitioner "with Angarita on the evening before the double murder, and [statements] . . . that the homicides were a 'hit' or carried out for financial gain at the direction of . . . Angarita." *See* Traverse at 47 (quotations omitted). Respondent argues Petitioner fails to show suppression because the defense had access to the tape-recorded interviews of Nance, DiLeonardo, and Angarita, *see* Answer at 58-59, and argues none of the interviews are favorable or material because they do not support a duress defense or a reasonable doubt defense, *see* Answer at 59.

The California Supreme Court denied this claim in a summary opinion issued following the state referee's findings. *See* Ex. F14.

Petitioner has shown favorability. Respondent argues the Laureano, DiLeonardo, and Angarita interviews contained no information supporting a duress or reasonable doubt defense. The Court concludes the record shows otherwise. The state referee found the prosecution "had information supporting [P]etitioner's claim that he had killed the Guerrero [b]rothers acting under the Colombian Mafia's threat," and that Nance's interview contained information about the death threats against Petitioner and his family. *See* Ref. Rep. at 22. At the guilt phase of Petitioner's trial, "the prosecutor ridiculed [P]etitioner's claim of having acted under Colombian Mafia death threats." *In re Bacigalupo*, 55 Cal.4th at 335 (emphasis in original). Accordingly, like Kesselman's interview, inasmuch as this evidence could have called into question the prosecution's narrative at trial, the evidence was favorable to Petitioner. *See Bagley*, 473 U.S. at

United States District Court
Northern District of California

37

683. For obvious reasons, the fact that Angarita was a suspect in the killings—which the state referee found was never disclosed to the defense—would have also been favorable to Petitioner. *See* Ref. Rep. at 19.

Petitioner has also shown suppression as to Nance, DiLeonardo, and Angarita. Respondent argues that "the deputy district attorney authorized the release of all taped interviews [including Nance, DiLeonardo, and Angarita] to the defense except for the taped interview of Kesselman." (*See* Answer at 57). As previously noted, however, the state referee found the prosecution did not turn over, nor did the defense have any knowledge of the contents of, the interviews given to police by Nance, DiLeonardo, and Angarita. *See* Ref. Rep. at 19. Respondent's contention is therefore unpersuasive.

Respondent also contends that Petitioner could have located Laureano by exercising reasonable diligence and that, if Laureano's reference hearing testimony was true, Petitioner should have been aware of the essential points of Laureano's statements. *See* Answer at 59-60. Petitioner does not appear to challenge any nondisclosure of Laureano's statements, but if he was attempting to do so, the Court concludes Petitioner has not shown suppression as to Laureano's statements. The prosecution never interviewed Laureano and, if Laureano's reference hearing testimony regarding his conversation with Petitioner is true, the Court agrees with Respondent that Petitioner "possessed the salient facts regarding the existence of" the conversation. *Raley v. Ylst*, 470 F.3d at 804.

### iii. *Brady* materiality/prejudice

The Court next considers materiality as to Claims C and D.

Citing *Benn*, Petitioner argues he is entitled to " 'a stricter standard of materiality—a standard of materiality that is more favorable to the defendant,' " as a result of the prosecution's use of Kesselman and Williams' false and misleading testimony at the *in camera* proceeding. *See* Fed. Pet. at 77 (citing *Benn v. Lambert*, 283 F.3d 1040, 1058, n.11 (9th Cir. 2002). Respondent disagrees.

In *Benn*, the defendant was convicted of killing two men. *See Benn*, 283 F.3d 1040. The defendant conceded that he shot the men, but alleged he did so in self-defense. At trial, the

38

1    prosecution alleged the defendant did not kill the men in self-defense, but rather killed them

2    "primarily in order to cover up his participation with the victims in an arson-insurance-fraud

3    scheme." *Id.* at 1044. The prosecution presented testimony from a jailhouse informant who

4    testified about various inculpatory statements allegedly made by the defendant and presented

5    "highly circumstantial evidence relating to the alleged arson." *Id.* at 1045. The Ninth Circuit held

6    the prosecution violated *Brady* when the prosecutor lied to defense counsel by claiming the

7    jailhouse informant was in a witness protection program, denied the existence of various benefits

8    given to the jailhouse informant in exchange for his testimony, allowed the jailhouse informant to

9    commit perjury without correcting the record, and omitted from a detective's report a Fire

10   Marshal's statement that the alleged arson, which was central to the prosecution's theory of guilt,

11   was accidental. While concluding that Petitioner would prevail under the usual *Brady* materiality

12   standard under the circumstances of his case, the Ninth Circuit noted a stricter standard of

13   materiality could be applied because "the prosecutor has knowingly relied on or condoned the use

14   of perjured testimony." *Id.* at 1058, n.11 (citing *Bagley*, 473 U.S. at 680). The stricter standard

15   would require that a " 'conviction must be set aside if there is any reasonable likelihood that the

16   false testimony could have affected the jury verdict.' " *Benn*, 283 F.3d at 1058, n.11 (citing

17   *United States v. Endicott*, 869 F.2d 252, 455 (9th Cir. 1989)).[17]

18           The Court has no doubt the prosecution's suppression of evidence and related conduct in

19   the present case is analogous to that in *Benn*. As Petitioner notes, the prosecution knowingly

20   presented misleading and incomplete testimony during the *in camera* hearing when Williams

21   persuaded Kesselman to lie and omit information regarding Angarita's statements that he "was an

22   instrument in th[e] murders" and that the killings were "murders for hire," *see* Ref. Rep. at 28-29.

23   Moreover, during Petitioner's guilt phase trial, the prosecution did not correct the record when it

24   called Tigiboy to the stand and allowed him to testify that he was not involved in drug trafficking

25

26   _____

27   [17] Citing *Wearry v. Cain*, Petitioner also argues the Supreme Court recently suggested materiality
     under *Brady* requires only " 'any reasonable likelihood' [the suppressed evidence] could have
     'affected the judgment of the jury.' " *Wearry v. Cain*, 136 S. Ct. at 1006. The standard
28   enunciated in *Wearry v. Cain* is the same as the "stricter standard" cited in *Benn*. The Court will
     therefore not address this argument separately.

despite having evidence that Tigiboy, while not a major drug dealer, was connected to Angarita and his drug trafficking operation, *see* Ref. Rep. at 23. The prosecution misled the trial court when it argued Petitioner's claim that the killings were hits ordered by organized crime was "totally speculative," *see* RT 3314, despite having evidence that Angarita told Kesselman the killings were payback over an old drug debt and that Angarita had ties to the Medellin drug cartel, *see* Ref. Rep. at 23. Finally, during closing arguments, the prosecutor took advantage of the suppressed evidence and misled the jury when it "ridiculed [P]etitioner's claim of having acted under Colombian Mafia death threats," *In re Bacigalupo*, 55 Cal.4th at 335, told the jury Petitioner's statement to police to that effect was a "total fabrication," *see* RT 3489, and argued that the "only rational explanation" for the killings was Petitioner's greed, *see* RT 3499. Accordingly, the Court concludes Petitioner is entitled to the stricter standard of materiality alluded to in *Benn*.

Under this standard, Petitioner has met his burden by showing a reasonable likelihood the suppressed evidence " 'could have affected the judgment of the jury.' " *Wearry v. Cain*, 136 S. Ct. at 1006. On direct appeal, the California Supreme Court noted that, "by finding the alleged robbery special circumstance to be true, *the jury necessarily decided that the murders were committed in the course of a robbery*." *People v. Bacigalupo*, 1 Cal. 4th at 125 (emphasis added). The Court also notes that the jury was given instructions for murder stating the intent element for murder could be found if "the killing (was done with malice aforethought) (*or*) (*occurred during the commission or attempt to commit a felony inherently dangerous to human life. Robbery is a felony inherently dangerous to human life*)." *See* CT at 391 (emphasis added). After reviewing the suppressed evidence, the state referee found that, had the prosecution turned the evidence over, the defense could have supported Petitioner's statement to police that he was ordered to carry out the killings by a Colombian criminal entity. *See* Ref. Rep. at 22-23. As noted above, the Court agrees. Statements and investigative information regarding Kesselman, DiLeonardo, Nance, and Angarita would have uncovered previously-unseen connections between the Guerrero brothers, Angarita, and the Medellin cartel would have substantially changed the character of the evidence presented by the prosecution during trial and would have affected the credibility of the prosecution

argument. Moreover, evidence supporting Petitioner's statement "would have substantially undermined the state's principal theory of motive." *Benn*, 283 F.3d at 1062; *see* RT 3499 (prosecutor noting, during closing argument, that "[t]he killing was to enable the defendant to successfully complete his robbery. I would submit to you that is exactly what the evidence shows in this case. . . there's no other rational explanation for the defendant's conduct"); *see* RT 3479-3480, RT 3485-90, RT 3494-3500, RT 3502-3503 (prosecutor's closing argument focusing on robbery allegations and robbery special circumstance); *see also Kyles v. Whitley*, 514 U.S. at 444 (observing that the "likely damage [to Petitioner's case] is best understood by taking the word of the prosecutor").

"[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. . . the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *See Stickler v. Greene*, 527 U.S. 263, 290 (1999) (citations omitted). Based on the Court's conclusion that introduction of the above-described evidence would substantially change the character of the guilt phase presentation, the Court finds that Petitioner has sufficiently shown materiality for purposes of *Brady*.

Relatedly, because Petitioner has shown the suppressed evidence was material, the Court also concludes that the evidence presented in the reference hearing would likely have affected the trial court's decision not to order the prosecution to disclose Kesselman's identity to the defense. The disclosure of confidential informants is governed by *Rovario v. United States*, 353 U.S. 53 (1957). In *Rovario*, the Supreme Court held that where the government opposes the disclosure of the identity of an informant, a trial court must balance the public's interest in protecting the flow of information against the individual's right to prepare his defense. *Id.* at 62. In balancing those interests, the Court must examine three factors: "(1) the degree of the informant's involvement in the criminal activity; (2) the relationship between [Petitioner's] asserted defense and the likely testimony of the informant; and (3) the government's interest in nondisclosure." *United States v. Gonzalo Beltran*, 915 F.2d 487, 489 (9th Cir. 1990). Respondent argues that Petitioner cannot

41

show that the balancing factors weighed in favor of disclosure of Kesselman's identity because "Kesselman had very little to contribute to [Petitioner's duress] defense" and the prosecution had an interest in protecting Kesselman's personal safety. *See* Answer at 49.

As noted above, Petitioner has shown that while Kesselman never testified that Angarita threatened Petitioner and his family, Kesselman's testimony was "significant for this case because it helps to establish a link between the homicides and Angarita's drug trafficking organization," *see* Ref. Rep. at 8, and "[t]he prosecution knew of Jose Angarita's connection with the Medellin drug cartel." *See* Ref. Rep. at 23. Moreover, as the California Supreme Court noted in overturning Petitioner's death sentence, Kesselman did not perceive any threat to her personal safety following her involvement in the federal drug prosecutions. *See In re Bacigalupo*, 55 Cal. 4th at 323. Accordingly, given Kesselman's firsthand knowledge of Angarita's drug trafficking activities and connections, the San Francisco meeting, and Angarita's erratic behavior following the killings, as well as her central role in statements by Nance and Price, the Court concludes there is a reasonable likelihood that, had the trial court been aware of the suppressed information, it would have granted Petitioner's motion to disclose Kesselman's identity.

Based on the aforementioned, Petitioner has shown that the California Supreme Court's denial of Claims C and D, except to the extent it denied Petitioner's claim as to statements by Laureano, was contrary to and an unreasonable application of Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1); *see Brady*, 373 U.S. at 87. Petitioner is entitled to relief on Claims C and D, except to the extent that Petitioner challenges the denial of Claim D as to the reference hearing testimony given by Laureano.

### D. Claim L

Petitioner contends the cumulative effect of the errors at his trial proceedings resulted in an unconstitutionally imposed guilty verdict, depriving Petitioner of a fair and reliable guilt determination in violation of his rights to due process, fair trial, unbiased jury, effective assistance of counsel, to present a defense, to confront and cross-examine, to a reliable determination of guilt, and to meaningful appellate review as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (*See* Fed. Pet. at 90).

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may have a " 'substantial and injurious effect' on the jury's verdict" so that a petitioner's conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (prejudice resulting from cumulative effect of improper vouching by prosecutor, improper comment by prosecutor about defense counsel, and improper admission of evidence previously ruled inadmissible required reversal even though each error evaluated alone might not have warranted reversal).

In addition to showing prejudice as a result of the *Brady* violations discussed in Claims C and D (except with respect to Laureano's testimony), Petitioner has shown that he was prejudiced by the cumulative effect of the errors identified in Claims A, C, and D. Collectively, these errors interfered with Petitioner's ability to present his theory of defense and ensure that the prosecution upheld its burden of proving every element, including intent, of the charged crimes beyond a reasonable doubt.

For example, as a result of the prosecution's suppression of favorable evidence and repeated attempts to mislead defense counsel and his investigators, the defense was left under the impression that investigation of Angarita would have been fruitless. *See* Ref. Rep. at 24. Trial counsel testified that, had he had access to information corroboration the duress defense, he "would have probed deeper into [P]etitioner's mental state. . . ." *See id.* Moreover, because of the trial errors, the jury was under the impression that no evidence supported Petitioner's claim that Tigiboy conveyed a threat on behalf of the Columbian mafia or even that the killings were anything but a plot to rob the Guerrero brothers' store, a notion which is severely questioned by the evidence adduced at the reference hearing. The jury was also misled into the impression that Tigiboy was an innocent bystander with no connections to drug trafficking and a victim of Petitioner's "machinations," *see* Traverse at 44. In addition, Petitioner was unable to introduce evidence supporting his statement to police so that it no longer appeared like a "vague and unsubstantiated assertion," *People v. Bacigalupo*, 1 Cal. 4th at 125, thereby depriving Petitioner's

trial counsel from arguing that the threats interfered with his ability to deliberate and premeditate the killings. Without these errors present, Petitioner's guilt phase trial would have been substantially different from the one which occurred, and the prosecution's claim that the "only rational explanation" for the killings was Petitioner's greed, *see* RT 3499, would have been severely undermined. Given the egregious nature of the prosecution's conduct, the potentially devastating effect of the suppressed evidence on prosecution witnesses' credibility, and Petitioner's resulting inability to fully present his theory of defense at trial, the Court is satisfied that the errors collectively had a "substantial and injurious effect" on the outcome of the trial. *Brecht*, 507 U.S. at 623.

Because Petitioner has shown rejection of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, *Richter*, 562 U.S. at 88, and has shown that the errors " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process,' " *Thomas v. Hubbard*, 273 F.3d 1164, 1181 (9th Cir. 2001) (overruled on other grounds in *Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002), Petitioner is also entitled to habeas relief based on Claim L.

## V.    CONCLUSION

After a careful review of the record and the pertinent law, the Court hereby orders as follows:

(1) The petition for writ of habeas corpus is **GRANTED** on the basis of the *Brady* errors described in Claims C and D, as well as on the basis of cumulative error as described in Claim L. Petitioner's judgment of conviction and sentence are accordingly **VACATED**.

(2) Claims A and B are **DENIED**. To the extent that they allege trial errors, they are also **MOOT**.

(3) Respondent shall release Petitioner from custody unless the state commences proceedings to retry him within 120 days of the date of entry of judgment on this order.

**IT IS SO ORDERED.**

Dated: September 25, 2018

BETH LABSON FREEMAN
United States District Judge